**IN THE CIRCUIT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**Springfield Division**

| | |
|---|---|
| ROBIN MEREDITH AND MELVIN MILLER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 22-cv-3083-SEM-KM |
| ) | |
| ILLINOIS DEPARTMENT OF ) | |
| TRANSPORTATION, ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Robin Meredith and Melvin Miller brought this lawsuit alleging that they were subjected to a hostile working environment because of their race. At the close of discovery, the Illinois Department of Transportation ("IDOT") seeks summary judgment, raising two separate grounds for granting that motion. First, IDOT contends that the nature of the allegations Meredith and Miller bring, even if true, are insufficient to establish a hostile working environment on the basis of race. Second, IDOT argues that even if they were subjected to a hostile working environment, it cannot be liable because the incidents they complain about were statements by a co-worker and not a supervisor.

Meredith and Miller complain about racial epithets made by Cameron McNeal. While not all comments are sufficient to trigger a hostile work environment claim, the

usage of the word "N**ger" is different. While a member of the DC Circuit, Justice Kavanaugh wrote, "No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African–Americans." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring). Usage of that word subjects black employees to a hostile work environment.

The second issue is whether the statement was made by a "supervisor." As IDOT notes in its brief, there is a critical difference between words used by a supervisor and words used by a co-worker. Here, Cameron McNeal has specifically admitted that he was their supervisor, and thus IDOT is liable for his statements.

A jury could reasonably find that: (1) Meredith and Miller were subjected to a hostile working environment, and (2) Cameron McNeal was their supervisor. For those reasons the motion for summary judgment should be denied and the matter set for trial.

**STATEMENT OF MATERIAL FACTS**

**A. Statements alleged by IDOT to be undisputed that Meredith and Miller do not dispute.**

1. Meredith is a black man, has been employed as a Maintenance Worker with IDOT for ten (10) years and has held the same position throughout his employment.

2. Miller is a black man and has been employed by IDOT since January 2, 2015 as Highway Maintainer. Miller worked at IDOT's central Sign Shop in Springfield, Illinois, from March 1, 2017, until he transferred to Fairview Heights, Illinois on November 1, 2021.

3. At all relevant times, Meredith was employed as a Maintenance Worker at the IDOT Central Sign Shop in Springfield, Illinois.

5. Meredith never had any complaint with respect to his supervisor Pelc.

8. Aside from the present matter, neither Miller nor Meredith have ever made any other internal complaints about discrimination while employed by IDOT.

10. Meredith told Miller about what Lercher supposedly heard regarding McNeal's racially derogatory statement while they were standing around with two other black men from a different IDOT facility and a white man in the Springfield Central Sign Shop.

11. On February 14, 2020, Illinois Department of Transportation's Bureau of Civil Rights received an internal complaint from IDOT Labor Relations with statements from Meredith and Miller alleging that McNeal made a racially derogatory statement.

16. McNeal voluntarily transferred to a different IDOT work location on August 16, 2020.

**B. Statements alleged by IDOT to be undisputed that Meredith and Miller dispute.**

4. Corey Pelc is an Operation Supervisor 11, Standard Sign Unit Chief with IDOT and is the only supervisor Meredith has had while employed by IDOT.

**Response:   This statement is disputed, at least in part. The term "supervisor" is important in this case. In the argument section of this brief Meredith and Miller address this issue in greater detail. Attached as Exhibit 1 and 2 are the sworn responses McNeal filed with the Illinois Department of Human Rights. McNeal specifically admits in those documents that he was the supervisor of both Meredith (Ex. 1 at 1) and Miller (Ex. 2 at 1).**

6. Cameron McNeal ("McNeal") was Meredith's lead worker, which is analogous to a foreman, for approximately two to three years.

**Response:   As outlined in response to statement 4, McNeal has admitted that he was the immediate supervisor of both Meredith and Miller. Attached as Exhibit 1 and 2 are the sworn responses McNeal filed with the Illinois Department of Human Rights. McNeal specifically admits in those documents that he was the supervisor of both Meredith (Ex. 1 at 1) and Miller (Ex. 2 at 1).**

7. A lead worker gives out job assignments and reports back to the supervisor on the progress of jobs.

**Response:   As outlined in response to statement 4, McNeal has admitted that he was the immediate supervisor of both Meredith and Miller. Attached as Exhibit 1 and 2 are the sworn responses McNeal filed with the Illinois Department of Human Rights. McNeal specifically admits in those documents that he was the supervisor of both Meredith (Ex. 1 at 1) and Miller (Ex. 2 at 1).**

9. Meredith and Miller contend that on or about January 14, 2020, there was one key incident that gave rise to their complaint against McNeal when they were informed at a later date that McNeal supposedly made a racially derogatory statement about them to another co-worker Randy Lercher.

**Response:   This statement is disputed because of the term "one key incident." While the January 14, 2020, incident was significant, it was not the only statement made by McNeal that forms the basis of their claim.**

12. On February 27, 2020, Rickey Davis was interviewed as part of an interval fact finding investigation pertaining to Plaintiffs' complaint. Plaintiffs notified Davis of their complaint on January 21, 2020, about hearing second-hand that McNeal made a racially derogatory statement. Davis and Pelc met with Lercher and Trello who allegedly heard McNeal directly and neither were willing to write or sign formal statements.

**Response:   Meredith and Miller dispute this statement because it is not based upon admissible evidence. The statement offered is not admissible as a business record exception to the hearsay rule for the reasons outlined *infra*.**

13. On March 23, 2020, Lercher was interviewed as part of an internal fact-finding investigation. Lercher stated to the investigator that he was about 10 yards from McNeal when the alleged derogatory statement was made. Lercher was not "one-hundred percent sure" he actually heard McNeal make the derogatory statement which Lercher heard as McNeal asking if there was a "nigger convention" in the room.

**Response:   Meredith and Miller dispute this statement because it is not based upon admissible evidence. The statement offered is not admissible as a business record exception to the hearsay rule for the reasons outlined *infra*.**

14. On March 23, 2020, Pelc was interviewed as part of an internal fact-finding investigation. Pelc related to the investigator that he was informed of the allegation by his immediate supervisor Ricky Davis. Davis instructed Pelc to meet with Lercher and Trello to obtain more information. Pelc related that neither Lercher or Trello were willing to affirmatively substantiate the claims made by Miller and Meredith. Pelc and Davis met with McNeal and informed him anonymously of the complaint and informed him that if what was said was true, it was not acceptable or professional.

**Response: Meredith and Miller dispute this statement because it is not based upon admissible evidence. The statement offered is not admissible as a business record exception to the hearsay rule for the reasons outlined *infra*.**

15. On March 23, 2020, McNeal was interviewed as part of a fact-finding investigation by the Illinois Department of Transportation's Bureau of Civil Rights. When interviewed, McNeal denied ever making the alleged derogatory statement and instead stated that his words were misinterpreted.

**Response: Meredith and Miller dispute this statement because it is not based upon admissible evidence. The statement offered is not admissible as a business record exception to the hearsay rule for the reasons outlined *infra*.**

**C. Meredith and Miller's additional statements of undisputed fact.**

1. McNeal was Miller's supervisor. Ex. 2 at 1.

2. McNeal was Meredith's supervisor. Ex. 1 at 1.

3. McNeal referred to Mexicans as "beaners" and "wetbacks." Doc. 23-3 at 4.

4. On one occasion McNeal told Meredith and Miller that he got into an altercation off of work and called a black homeless man a "n\*\*ger." Doc. 23-3 at 4, Doc. 23-4 at 20.

5. McNeal made a comment in the workplace that it appeared as though there was a "n\*\*gger" convention going on. Doc. 23-4 at 6, Doc. 23-3 at 4, 5.

6. McNeal told Meredith and Miller that a friend allowed him to call him "Big N\*\*ger." Doc. 23-4 at 5.

7. Miller was treated by a psychiatrist because of the stress associated with the comments made by McNeal. Doc. 23-4 at 9.

8. Meredith personally found the statements of McNeal to create a hostile working environment. Ex. 3.

## ARGUMENT

### A. Summary judgment can only be granted when there are no disputes of material fact, and it is clear that judgment should be entered in favor of the moving party.

The standards governing a Fed.R.Civ.P. 56 motion for summary judgment are well established. In deciding a motion for summary judgment, the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, it is the function of this Court in ruling on a motion for summary judgment to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Omnicare Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The Seventh Circuit has reminded Courts that the role of the courts when reviewing summary judgment is not to act as a jury. *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012). "When ruling on a motion for summary judgment, the party

opposing the motion gets the benefit of all facts that a reasonable jury might find."

*Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011).

We "do not weigh conflicting evidence, resolve swearing contests, determine

credibility, or ponder which party's version of the facts is most likely to be

true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021).

**B. The nature of the statements repeatedly by McNeal are sufficient to establish that Meredith and Miller were subjected to a hostile working environment.**

IDOT's brief trivializes the number and the significance of the statements made by

McNeal. There are at least three occasions when he used the "N\*\*ger" word in the

workplace while communicating with Meredith and Miller. Both described the usage

of the word as creating a hostile working environment, with Miller resorting to

professional treatment as a result. The Seventh Circuit has made it clear that when

an employee is "repeatedly subjected to hearing the word 'n[\*\*]ger,' " that is enough to

create a hostile work environment. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473,

477 (7th Cir. 2004); *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir.

2022).

The Seventh Circuit has explained that "[p]erhaps no single act can more quickly

'alter the conditions of employment and create an abusive working environment' than

the use of an unambiguously racial epithet such as [the N-word] by a supervisor in the

presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668,

675 (7th Cir. 1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106

S.Ct. 2399 (1986)); *see also Alston v. Town of Brookline*, 997 F.3d 23, 47 (1st Cir. 2021);

9

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015); *Ellis v. Houston*, 742 F.3d 307, 325-26 (8th Cir. 2014); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014); *McGinest v. GTE Serv.*, 360 F.3d 1103, 1116 (9th Cir. 2004). The N-word has been further described as "a term that sums up ... all the bitter years of insult and struggle in America, [a] pure anathema to African-Americans, [and] probably the most offensive word in English." *Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J., concurring).

While it is possible that a jury would not be convinced that there was a hostile work environment, that is a question for a jury to decide at trial and not to be determined at summary judgment.

## C. A jury could reasonably conclude that McNeal was Meredith and Miller's supervisor.

IDOT contends that McNeal was not a supervisory employee, and thus, it cannot be held strictly liable for his actions. The problem with this conclusion is that McNeal, under oath, admitted that he served as the supervisor for both of them. *See Valentine v. City of Chicago*, 452 F.3d 670, 678 (7th Cir. 2006). Looking at the competing evidence, a jury could conclude that McNeal was their supervisor, making IDOT liable for his actions. As such, summary judgment as to this issue is not appropriate.

## D. IDOT cannot rely upon its internal investigation for the truth of matters asserted therein at summary judgment.

Motions for summary judgment must be supported by admissible evidence. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).  Throughout its brief, IDOT

references an internal investigation, *see* Doc. 23-5, and suggests that statements made by individuals interviewed as part of that investigation are critical facts. While IDOT doesn't specifically indicate how the investigative report would be admissible, it attaches Adam Graham's affidavit in an apparent attempt to admit the document as a business record under Fed.R.Evid. 803(6). Doc. 23-5 at 23-24. An investigatory report that incorporates the statements of individuals who have motivations not to be truthful is not properly admitted as a business record for its truth.

The business record exception to the hearsay rule exists because business records are considered trustworthy. When a company records documents of its business transactions in the regular course of its business, it has little reason not to be accurate. *Bracey v. Herringa*, 466 F.2d 702, 704 (7th Cir. 1972). While portions of the investigatory report might be admissible, the statements attributable to Cory Pelc (Doc. 23-5 at 20-21), Cameron McNeal (Doc. 23-5 at 19), and Rickey Davis (Doc. 23-5 at 18) lack the guarantee of trustworthiness that is the hallmark of a business record. Each of them would have a clear motivation not to be truthful.

This analysis is not new. Decades ago the Supreme Court analyzed a similar issue when it looked at whether reports from a railroad accident were admissible under the exception. There the railroad had conducted an investigation after an accident and sought to utilize the statements included in its investigation as evidence. In *Palmer v. Hoffman,* 318 U.S. 109, 113–14, 63 S. Ct. 477, 480 (1943), the Supreme Court found that such investigatory materials was not admissible:

11

The engineer's statement which was held inadmissible in this case falls into quite a different category. It is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. If it did, then any law office in the land could follow the same course, since business as defined in the Act includes the professions. We would then have a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy. Any business by installing a regular system for recording and preserving its version of accidents for which it was potentially liable could qualify those reports under the Act. The result would be that the Act would cover any system of recording events or occurrences provided it was 'regular' and though it had little or nothing to do with the management or operation of the business as such. Preparation of cases for trial by virtue of being a 'business' or incidental thereto would obtain the benefits of this liberalized version of the early shop book rule. The probability of trustworthiness of records because they were routine reflections of the day to day operations of a business would be forgotten as the basis of the rule.

For these same reasons, the statements of Pelc, McNeal, and Davis cannot be relied upon here.

**CONCLUSION**

Looking at the undisputed evidence, a jury could find that Meredith and Miller were subjected to a hostile working environment and that McNeal was their supervisor. For those reasons, the motion for summary judgment must be denied, and this matter must be set for trial.

ROBIN MEREDITH and MELVIN MILLER
*June 25, 2025*


By: s/ John A. Baker
        Their Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
(T) (217) 522-3445
(F) (217) 522-8234
(E) jab@bbklegal.com

# CERTIFICATE OF SERVICE

This document was filed utilizing this Court's ECF system. A copy will automatically be submitted to opposing counsel electronically.

*June 25, 2024*

By: /s/ John A. Baker

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:   (217) 522-3445
Facsimile:   (217) 522-8234
E-mail:   jab@bbklegal.com