IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROBIN MEREDITH and MELVIN MILLER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-3083 |
| | ) | |
| ILLINOIS DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is Defendant Illinois Department of Transportation's Motion for Summary Judgment. (Doc. 23).

## I.     FACTUAL BACKGROUND

Plaintiffs Robin Meredith and Melvin Miller filed a complaint against Defendant Illinois Department of Transportation (Defendant or IDOT) asserting hostile work environment claims based on their race under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. (Doc. 1). The claims arise from statements allegedly made by an alleged supervisor for Defendant. (*Id.* at ¶¶7-12). Defendant seeks the entry of summary judgment as to all claims.

Plaintiff Meredith is a black man who has been employed as a maintenance worker with Defendant for ten years. (Doc. 23-1, ¶1). Plaintiff Miller is a black man who has been employed as a highway maintainer with Defendant for almost ten years. (*Id.* at ¶2). At all

relevant times, Meredith was employed at the IDOT Central Sign Shop in Springfield, Illinois. (*Id.* at ¶3).

Defendant alleges Corey Pelc, as an Operation Supervisor 11, Standard Sign Unit Chief with IDOT, was Meredith's supervisor at IDOT. (*Id.* at ¶4). Plaintiffs dispute the assertion and allege Cameron McNeal was the supervisor of both Plaintiffs. (Doc. 26 at 3). Meredith never had any complaint with respect to Pelc. (Doc. 23-1, ¶5). Meredith testified that Pelc was the only supervisor he ever had. (Doc. 23-3 at 11-12). Miller testified McNeal was his lead worker while another employee, Ricky Davis, was his supervisor at the Central Sign Shop. (Doc. 23-4 at 15-16). Defendant claims McNeal was Meredith's lead worker, which is analogous to a foreman, for approximately two to three years. (Doc. 23-1, ¶6). A lead worker provides job assignments and reports back to the supervisor on the progress of jobs. (*Id.* at ¶7).

Excluding the present matter, neither Plaintiff has ever made any other internal complaints about discrimination while employed by IDOT. (*Id.* at ¶8). The primary incident giving rise to Plaintiffs' complaint occurred on or about January 14, 2020, though Plaintiffs were not immediately informed about McNeal's alleged racially derogatory statement about them to another co-worker Randy Lercher. (*Id.* at ¶9). Meredith told Miller about what Lercher supposedly heard regarding McNeal's racially derogatory statement while they were standing around with two other black men from a different IDOT facility and a white man in the Springfield Central Sign Shop. (*Id.* at ¶10).

On February 14, 2020, Defendant's Bureau of Civil Rights received an internal complaint from IDOT Labor Relations with statements from Meredith and Miller alleging

McNeal made a racially derogatory statement. (*Id.* at ¶11). According to the IDOT investigative report, on February 27, 2020, Central Sign Stop Section Chief Rickey Davis was interviewed as part of an internal fact finding investigation pertaining to Plaintiffs' complaint. (Doc. 23-5 at 93). The report provides that Plaintiffs notified Davis of their complaint on January 21, 2020, after hearing second-hand that McNeal made a racially derogatory statement. (*Id.* at 86). Davis and Pelc met with highway maintainers Randy Lercher and Greg Trello, both of whom are white, who allegedly heard McNeal make the racially offensive remark. (*Id.* at 85-94). Neither Lercher nor Trello were willing to write or sign formal statements. (*Id.* at 88-91). Plaintiffs dispute the allegations that are based on the IDOT investigative report, contending that the statements therein constitute inadmissible hearsay. (Doc. 26, Pl. Resp. ¶12).

On March 23, 2020, Lercher was interviewed as a part of an internal fact-finding investigation. (Doc. 23-5 at 117). Lercher told the investigator that he was about ten yards from McNeal when the alleged derogatory statement was made. Lercher was not "one hundred percent sure" he actually heard McNeal make the derogatory statement which Lercher heard as McNeal asking if there was a "[N-word] convention" in the room.[1] *Id.*

On March 23, 2020, Pelc was interviewed as part of the investigation. (Doc. 23-1, ¶14). Pelc related to the investigator that he was informed of the allegation by his immediate supervisor, Ricky Davis. (*Id.*) Davis instructed Pelc to meet with Lercher and Trello to obtain more information. (*Id.*) Pelc stated that neither Lercher nor Trello were

---

[1] Plaintiffs dispute the admissibility of these statements which are contained in IDOT's investigative report. (Doc. 26, Pl. Resp. ¶13).

willing to affirmatively substantiate the claims made by Miller and Meredith. (*Id.*) Pelc and Davis met with McNeal and informed him of the existence of the anonymous complaint and told him that if he did make the statement, "it is not acceptable or professional."[2] (*Id.*)

On March 23, 2020, McNeal was interviewed as part of the investigation. (Doc. 23-5 at 23, 116). McNeal denied ever making the alleged derogatory statement and instead stated his words were misinterpreted. (*Id.* at 23-27, 116). He stated he actually made a comment about there being a "well-digger convention." (*Id.* at 116).

Plaintiffs contend McNeal made other comments that were racially derogatory and offensive. (Doc. 26, ¶¶3-6). Meredith testified that McNeal referred to Mexicans as "beaners" and "wetbacks." (Doc. 23-3 at 16). Moreover, on one occasion, McNeal told Meredith that he got into an altercation after work and called a black homeless man a "[N-word]." (*Id.*) Miller testified McNeal once told him that he had a black friend who allowed McNeal to call him "Big [N-word]." (Doc. 23-4 at 17).

On August 16, 2020, McNeal voluntarily transferred to a different work location. (Doc. 23-5 at 13).

In seeking summary judgment, Defendant contends that, even if Plaintiffs' allegations are true, they are insufficient to establish a hostile work environment based on race. Furthermore, even if Plaintiffs were subjected to a hostile work environment,

---

[2] Plaintiffs dispute the admissibility of these statements. (Doc. 26, Pl. Resp. ¶14).

Defendant cannot be liable because the statements at issue were made by a coworker and not a supervisor.

## II.   DISCUSSION

### A. Legal Standards

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit, and a factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Biggs v. Chic. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023) (internal quotation marks and citation omitted). The Court views the evidence and construes all reasonable inferences in favor of the non-movant. *Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Driveline Systems*, 936 F.3d at 579 (internal quotation marks omitted).

In claiming the summary judgment motion should be denied, Plaintiff contends there are factual disputes regarding whether Plaintiffs Meredith and Miller were subjected to a hostile work environment and whether McNeal was their supervisor. Under Title VII, a work environment is hostile "[w]hen the workplace is permeated with

'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a hostile work environment claim based on race, a plaintiff must show: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on [race]; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Scaife v. United States Dept. of Veterans Affairs*, 49 F.4th 1109, 1115-16 (7th Cir. 2022). In determining whether the conduct is severe or pervasive, courts consider the totality of circumstances, including: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Id.* at 1116. For there to be a basis for employer liability, a supervisor must have been a participant in the harassment or the employer must be "negligent in discovering or remedying co-worker harassment." *Liu v. Cook County*, 817 F.3d 307, 318-19 (7th Cir. 2016).

Plaintiffs object on hearsay grounds to certain statements contained in Defendant's investigative report, claiming that the statements attributable to Cory Pelc, Cameron McNeal, and Rickey Davis lack the guarantee of trustworthiness that is the hallmark of a business record because those individuals have a motivation to be untruthful. Defendant contends the report is admissible as a business records exception under Rule 803(b)(6), which allows admission if five conditions are met: (1) "the record was made at or near

the time by—or from information transmitted by—someone with knowledge;" (2) "the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;"(3) "making the record was a regular practice of that activity;" (4) "all these conditions are shown by the testimony of the custodian or another qualified witness;" and (5) "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(b)(6).

The investigative report is accompanied by the declaration of Adam Graham, Bureau Chief for the Illinois Department of Transportation's Bureau of Civil Rights, who states that each condition is met. While the Court recognizes McNeal had a motivation to be untruthful during the investigation,[3] the Court has no basis to believe that Pelc or Davis had such a motivation and Plaintiffs do not explain why those individuals would have been motivated to be untruthful. Additionally, much of the information in the investigative report is not being considered for the truth of the matter. Rather, it is admissible to explain any actions that IDOT did or did not take upon receiving the internal complaint.

### B. Basis for IDOT's Liability

It does not appear there is a basis for employer liability because the record neither indicates that McNeal was Plaintiffs' supervisor nor that IDOT failed to take remedial

---

[3] Because the evidence is viewed in a light most favorable to Plaintiffs, the Court presumes that McNeal made the racially offensive statement based on other evidence in the record, notwithstanding McNeal's denial during the internal investigation.

action. In the Title VII context, "'supervisor' is a term of art that denotes more than an individual with higher rank, a superior title, or some oversight duties." *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 390 (7tt Cir. 2010). A supervisor has "the power to directly affect the terms and conditions of the plaintiff's employment," which generally means "the authority to hire, fire, promote, demote, discipline or transfer" the employee. *Jajeh v. County of Cook*, 678 F.3d 560, 568 (7th Cir. 2012).

The only evidence Plaintiffs present in support of their assertion that McNeal was their supervisor are McNeal's answers to Meredith's and Miller's charges of discrimination brought before the State Department of Human Rights. (Docs. 26-1, 26-2). In the answer, McNeal is asked to admit or deny whether "he was previously in a supervisory position over [Plaintiffs] at IDOT." (*Id.*) McNeal is not asked to admit or deny whether he was Plaintiffs' supervisor for purposes of Title VII. Plaintiff Meredith testified that Pelc was the only supervisor he ever had. Plaintiff Miller testified that Davis was his supervisor. It appears that, as lead worker, McNeal may have outranked Plaintiffs or had certain oversight duties over them. However, there is no indication that McNeal had "the power to directly affect the terms and conditions" of their employment. Therefore, McNeal was not either Plaintiff's supervisor under Title VII.

There is also no evidence that IDOT was "negligent in discovering or remedying co-worker harassment." The record establishes Defendant commenced an investigation the same month that the complaint was made to Defendant's Bureau of Civil Rights. The two individuals who allegedly heard McNeal use the N-word were not willing to make a definitive, affirmative statement. McNeal denied making a racially offensive remark

and was eventually transferred to a different work location. Having determined that McNeal was not Plaintiffs' supervisor in the context of Title VII and that IDOT reasonably investigated the alleged co-worker harassment, the Court concludes there is no basis for employer liability and Plaintiffs' hostile work environment claim fails.

## C. Severity and Pervasiveness of Conduct

Even if a basis for employer liability existed, the Court is unable to conclude that the conduct was sufficiently severe and pervasive to establish a hostile work environment claim. The record includes evidence of only one racially derogatory statement allegedly made by McNeal that was brought to the attention of Defendant. While Plaintiffs allege McNeal made other racially offensive statements, there is no evidence that Defendant was aware of those alleged statements. While a reasonable person would certainly deem the alleged statement to be highly offensive, the statement was not physically threatening nor directed at Plaintiffs. Based on Plaintiff Miller's testimony that he was treated by a psychiatrist and Meredith's statement that he personally experienced a hostile work environment due to McNeal's statement, the Court recognizes that the statement did interfere with Plaintiffs' work performance.

While the record includes only the one-time use of a racial epithet that was brought to Defendant's attention, the Seventh Circuit has stated that because the N-word is such an egregious racial slur, "[a] one-time use of the epithet can in some circumstances warrant Title VII liability." *Scaife*, 49 F.4th at 1116; *see also Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) ("No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and

discrimination against African-Americans.") (citation omitted). The one-time use of the epithet in *Scaife* involved the plaintiff hearing from her co-workers that a supervisor in another department had called her a "stupid fucking n****r." *Id.* at 1116. The court found it significant that Scaife heard about the slur from a co-worker and noted that, while "racial epithets do not always have to be stated directly to a plaintiff to create an objectively hostile work environment, remarks that are stated directly to the plaintiff weigh heavier than when a plaintiff hears them secondhand." *Id.* (internal citation omitted). The court observed that "second-hand harassment" is not as significant as harassment directed at the individual. *Id.* Ultimately, the Seventh Circuit concluded that based on the totality of circumstances, the use of the N-word outside the plaintiff's presence by an individual who did not have direct supervisory control over her was not severe enough for a jury to determine that she experienced a hostile work environment based on race. *Id.* at 817.

While the Court finds *Scaife* to be somewhat analogous to the instant case, the use of the racial epithet in *Scaife* was actually more egregious because unlike in the instant case, the individual in *Scaife* was referring to the plaintiff when he used the N-word. Based on the reasoning in *Scaife*, the Court concludes that even if Plaintiff could establish a basis for employer liability, this is not a case in which the one-time use of the N-word warrants Title VII liability. Even when the evidence and all reasonable inferences are construed in Plaintiffs' favor, Defendant is entitled to summary judgment on Plaintiffs' hostile work environment claim.

III.    CONCLUSION

For the reasons stated herein, the Court concludes there is no basis for employer liability because there is no genuine dispute that McNeal was not Plaintiffs' supervisor and the record establishes that Defendant was not "negligent in discovering or remedying co-worker harassment." Even if there was a basis for employer liability, Plaintiffs' hostile work environment claim would fail because the one-time use of the N-word outside of Plaintiffs' presence was not sufficiently severe or pervasive for a jury to render a verdict in Plaintiffs' favor.

For all of these reasons, Defendant Illinois Department of Transportation's Motion for Summary Judgment [Doc. 23] is GRANTED.

The Clerk will enter judgment in favor of Defendant and terminate this case.

ENTER:  March 20, 2025

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE